UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARUN BHATTACHARYA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NIELSEN HOLDINGS PLC, DWIGHT MITCHELL BARNS and JAMERE JACKSON,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Arun Bhattacharya ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, United States Securities and Exchange Commission ("SEC") filings, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.    This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of Nielsen Holdings plc ("Nielsen" or the "Company") between February 8, 2018 and July 25, 2018, both dates inclusive (the "Class Period"), against Nielsen and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act"), including the Company's Chief Executive Officer ("CEO") and

Executive Chairman of the Board of Directors, Dwight Mitchell Barns ("Barns"), and Chief Financial Officer ("CFO"), Jamere Jackson ("Jackson").

## INTRODUCTION AND BACKGROUND

2.      Nielsen describes itself as a leading global performance management company providing its clients a comprehensive understanding of what consumers watch and what they buy and how those choices intersect. The Company divides its business client offerings into two major offering groups, including its "Buy" offering group of products and services and its "Watch" offering segments of products and services. The Company provides critical media and marketing information, analytics, and manufacturer and retailer expertise about what and where consumers buy ("Buy") and what consumers read, "Watch" and listen to (consumer interaction across the television, radio, print, online, digital, mobile viewing and listening platforms).

3.      More specifically, the Company's Buy segment of offerings purports to provide retail transactional measurement data, consumer behavior information and analytics primarily to businesses in the consumer packaged-goods industry, utilizing its "extensive database of retail and consumer information" and its "advanced analytical capabilities" to provide "strategic insights that influence [its] clients' key business decisions." As part of the measurement of consumer data, the Company "track[s] billions of sales transactions per month in retail outlets globally and [its] data is used to measure their sales and market share." In 2017, the Company's Buy segment generated 49% of the Company's total revenue.

4.      The Company's Watch segment "provides viewership and listening data and analytics primarily to the media and advertising industries across the television, radio, print, online, digital, mobile viewing and listening platforms." According to the Company, its Watch data is used by media clients to understand their audiences and establish the value of their

advertising inventory. In the Watch segment, ratings are the primary metrics used to determine the value of programming and advertising in the U.S. television advertising marketplace. In 2017, Watch generated 51% of the Company's consolidated revenue.

5.     The Company's February 8, 2018 Form 10-K provides additional details as it describes how the Company sources consumer data for the measurement services that the Company provides and its reliance on large data set providers, including Facebook, to provide census and demographic data through access to Facebook's millions of user profiles provided by Facebook and other data sourcing partners. For example, the Company describes its Digital Audience Measurement Program within its Watch segment as follows:

Digital Audience Measurement

We are a global provider of digital media and market research, audience analytics and social media measurement. We employ a variety of measurement offerings in the various markets in which we operate to provide digital publishers, internet and media companies, marketers and retailers with metrics to better understand the behavior of online audiences. ***Through a combination of patented panel and census data collection methods, we measure and study the internet surfing, online buying, and video viewing (including television content) of digital audiences. In addition to measuring overall internet usage, Nielsen is the only company that has a Media Ratings Council ("MRC") accredited age and gender people measurement across its U.S. Digital Ad Ratings and U.S. Digital in TV Ratings Services***. . . .

***Since 2010, Nielsen has been providing innovative census measurement in cooperation with third party data enrichment providers such as Facebook. We have privacy-protected and anonymous access to audience data from over 9.5 billion unique device IDs, which at this point is matched to over 350 million unique user profiles***.

\*       \*       \*

Nielsen Social is the leading provider of social TV measurement, audience engagement and advertising solutions for TV networks, agencies and advertisers, helping the industry measure, understand and act on TV-related across Facebook, Twitter and Instagram beginning in [sic] (beginning in January 2018). ***Along with tracking program-related activity on Facebook and Twitter around linear airtimes, Nielsen Social also track social TV activity in the U.S. on a 24/7 basis***.

Nielsen Social uses this data to power Social Content RatingsTM, the first standardized, third-party measurement of program-related activity across Facebook, Twitter and Instagram . . . .

6.    During the Class Period, Nielsen repeatedly assured investors that its measurement and analytics services provided to customers were continuously viable and strong. In addition, according to the Company, because privacy was built into the way its business processes, the enactment of the European General Data Protection Regulation ("GDPR") would not impact its business, nor limit necessary access to large data sets provided by its partners like Facebook. Accordingly, despite business challenges in certain geographic regions, specifically emerging markets, as late as June 5, 2018 defendants also stated the Company's 2018 financial outlook for revenue earnings and free cash flow of $800 million remained on track.

- "[V]ery strong relationship that we have with Facebook. *We still have access to the data we need for our measurement products*."

- "*For measurement*, *we still have the access to all the data that we need for our measurement products, including our relationship with Facebook*."

- "[The GDPR] has been more of a *non[-]event* from our side as compared to how it played out for some others."

- "*Our free cash flow target for the year is $800 million. . . . And so that's what we're working on to deliver, and we're on track for that*."

7.    Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Nielsen recklessly disregarded its readiness for and the true risks of privacy related regulations and policies, including the GDPR, on its current and future financial and growth prospects; (ii) Nielsen's financial performance was far more dependent on Facebook and other third-party large data set providers than previously disclosed and privacy policy changes affected the scope and

terms of access Nielsen would have to third-party data; (iii) access to Facebook and other third-party provider data was becoming increasingly restricted for Nielsen and Nielsen clients; and (iv) as a result, Nielsen's public statements were materially false and misleading at all relevant times.

8.    As a result of the material misrepresentations and omissions, Nielsen stock traded at artificially inflated prices as high as $34.00 per share.

9.    Then, on July 26, 2018, Nielsen shocked investors as it published its financial results for second quarter 2018 announcing that it had missed revenue and earnings targets and was relieving its forecast of $800 million free cash flow for 2018, that the GDPR was affecting partners and clients, and that CEO Barns would retire at the end of 2018.

- *"General Data Protection Regulation and changes in the consumer data privacy landscape impacted our growth rates in the near-term as clients and partners grapple with the changes and work to ensure compliance."*

- *"Marketing Effectiveness revenues increased 7.2%, or 6.0% on a constant currency basis, . . . partly offset by pressure on our clients and partners from the impact of the General Data Protection Regulation (GDPR) and other consumer data privacy considerations."*

- *"[Our] digital advertising ecosystem saw a disruption in the second quarter as large digital platforms made changes to their offerings to increase security for consumer data."*

- *"Second, we expect operational and policy changes on third-party targeting to contribute to a slowdown in the back half of the year."*

10.    The July 26, 2018 second quarter 2018 press release also issued sharp revisions to EBITDA margin growth, a $0.56 reduction of projected net income and a $250 million reduction free cash flow guidance, which was sharply below guidance issued in April 2018 after the first quarter 2018 financial results:

|  | Revised | April |
|---|---|---|
| Total Revenue (constant currency basis) | ~(1%) | ~3% |
| Adjusted EBITDA margin growth (constant currency basis) | ~(230)bps | ~(60)bps |
| GAAP net income per share | $0.95 - $1.00 | $1.50 - $1.56 |
| Free cash flow | $550 - $575M | ~$800M |

11.    As a result of these alarming disclosures and significant reduction in the Company's outlook for free cash flow, Nielsen's stock price declined more than 25% from a close of $29.57 per share on July 25, 2018 to a close of $22.11 per share on July 26, 2018, on a massive volume of 38 million shares traded.

## JURISDICTION AND VENUE

12.    Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b), because Nielsen is headquartered in this Judicial District and many of the acts and practices complained of herein occurred in substantial part in this Judicial District.

## PARTIES

14.    Plaintiff purchased or acquired Nielsen common stock during the Class Period as described in the attached certification and was damaged thereby.

15.    Defendant Nielsen Holdings plc is incorporated in the United Kingdom and trades on the New York Stock Exchange ("NYSE") under the symbol "NLSN." The Company's headquarters are located in New York and London.

16.     Defendant Dwight Mitchell Barns has served at all relevant times as Chairman of the Board of Directors and CEO of Nielsen.

17.     Defendant Jamere Jackson has served at all relevant times as the CFO of Nielsen.

18.     Defendants Barns and Jackson are sometimes collectively referred to herein as the "Individual Defendants."

19.     As officers and controlling persons of a publicly held company whose common stock was and is traded on the NYSE and is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

20.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Nielsen, each of the Individual Defendants had access to the adverse undisclosed information about the Company's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Nielsen and its business or adopted by the Company materially false and misleading.

21.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

22.    The Company and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Nielsen common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Nielsen's business, operations, management and the intrinsic value of Nielsen common stock; and (ii) caused plaintiff and other members of the Class (defined herein) to purchase Nielsen common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### False and Misleading Statements Issued During the Class Period

23.    On February 8, 2018, Nielsen announced its fourth quarter and fiscal year 2017 financial results in a press release. The press release highlighted the Company's strong growth within the Company's Watch segment and increased fourth quarter EBITDA as compared to fourth quarter 2016. The Company also provided full year financial guidance including Adjusted EBITDA margin growth of ~60 basis points and free cash flow of $800 million:

**NIELSEN REPORTS 4th QUARTER AND FULL YEAR 2017 RESULTS**

8

. . . Nielsen Holdings plc today announced its fourth quarter and full year 2017 results. Revenues were $1,761 million for the fourth quarter of 2017, up 6.3%, or 4.2% on a constant currency basis, compared to the fourth quarter of 2016. Revenues were $6,572 million for the full year of 2017, up 4.2%, or 3.8% on a constant currency basis compared to 2016.

\*        \*        \*

**<u>Fourth Quarter 2017 Operating Results</u>**

Revenues within the Watch segment for the fourth quarter of 2017 increased 15.9% to $913 million, or 14.8% on a constant currency basis, compared to the fourth quarter of 2016. Excluding the acquisition of Gracenote completed on February 1, 2017, Watch revenues increased 7.4%, or 6.4% on a constant currency basis. Audience Measurement of Video and Text revenues increased 20.6%, or 19.2% on a constant currency basis. Excluding the acquisition of Gracenote, Audience Measurement of Video and Text revenues increased 7.7%, or 6.5% on a constant currency basis, primarily due to our ongoing investments and continued client adoption of our Total Audience Measurement system. Audio revenues increased 9.2% on a reported and constant currency basis for the fourth quarter of 2017 due to timing of deliveries. Marketing Effectiveness revenues increased by 36.1%, or 32.9% on a constant currency basis, driven by continued strength in our product initiatives, including data deliveries and consistent investment in our product portfolio. Other Watch revenues decreased 34.8%, or 33.8% on a constant currency basis, due to continued portfolio pruning.

Revenues within the Buy segment for the fourth quarter of 2017 decreased 2.3% to $848 million, or 5.3% on a constant currency basis, compared to the fourth quarter of 2016. Buy emerging markets revenues increased 7.4%, or 4.8% on a constant currency basis, as our global footprint, coverage expansion, and broad product offerings continued to position us well with both local and multinational clients in these markets. . . .

Net income for the fourth quarter of 2017 decreased 49.1%, or 50.6% on a constant currency basis, to $81 million, compared to $159 million in the fourth quarter of 2016. Net income per share on a diluted basis was $0.23 per share, compared to $0.44 for the fourth quarter of 2016. During the fourth quarter of 2017, the company recorded a provisional non-cash tax charge of $104 million, or $0.29 per share. Excluding this expense, net income per share on a diluted basis was $0.52 per share, an increase of 18.2% percent year-on year, as referenced in the "Certain Non-GAAP Measures" section. The provisional tax charge was incurred as a result of the recently enacted Tax Cuts and Jobs Act ("TCJA") and includes a one-

time repatriation tax. This provisional amount is subject to adjustment during a measurement period of one year following the enactment of TCJA, as provided by recent Securities and Exchange Commission ("SEC") guidance.

Adjusted EBITDA for the fourth quarter of 2017 increased 5.7%, or 3.8% on a constant currency basis, to $579 million, compared to the fourth quarter of 2016. Adjusted EBITDA margins contracted 21 basis points, or 14 basis points on a constant currency basis, to 32.9%, due to our investments in growth and efficiency initiatives.

\*       \*       \*

**Financial Position**

As of December 31, 2017, Nielsen's cash and cash equivalents were $656 million and gross debt was $8,441 million. Net debt (gross debt less cash and cash equivalents) was $7,785 million and our net debt leverage ratio was 3.83x at the end of 2017. . . .

Cash flow from operations increased to $1,310 million for the full year of 2017, from $1,296 million in 2016. Free cash flow for the full year of 2017 decreased to $863 million, compared to $941 million in 2016. Cash flow performance was driven by higher Adjusted EBITDA, offset by higher cash taxes, interest and net capital expenditures.

\*       \*       \*

**2018 Full Year Guidance**

The company is maintaining its full year guidance as highlighted below:

- Total revenue growth on a constant currency basis: ~3%

- ***Adjusted EBITDA margin growth on a constant currency basis: ~(60)bps***

- GAAP net income per share: $1.40 - $1.46

- ***Free cash flow: ~$800 million***

24.     On the same day, the Company held a conference call for analysts and investors to discuss the fourth quarter and fiscal year 2017 financial results. The call was hosted by defendants Barns and Jackson. During the call, in addition to reiterating the financial metrics

10

stated in the press release, defendants assured the market that the Company was ready for the upcoming effective date of the GDPR and that the new law was not impacting and would not have any impact on its business and Nielsen would still have access to all the data needed to provide services to its clients:

> [Analyst:] . . . *I was wondering if you could talk about how GDPR might be impacting or might impact the business* in Europe in the coming year? I could imagine it might be helpful for panels. And I'm curious how it might impact eXelate and Nielsen Marketing Cloud more generally. Love to hear your thoughts on both of those?

> [Barns:] *I'll start with GDPR*. Thanks, Brian. And then I'll have Jamere address the first part of your question. *GDPR, we've been focused on this for some time*. We have a big team that's working on it. We've been out in front of it. We're ready. And we don't see any significant impact for our Buy business*. For Watch, there'll be some things that we'll have to do to ensure our compliance with the regulations, but it's manageable. *We don't expect to see any major impact on our business. We still – we'll still have access to all the data that we're going to need for our products. So yes, we're in good shape*.

25.     After the February 8, 2018 financial results and conference call the Company's shares traded at artificially inflated prices above $32 per share.

26.     On April 26, 2018, the Company issued a press release announcing the financial results for the first quarter 2018. The press release highlighted the growth in the Company's Watch segment including strong growth in the Audience Measurement:

> Nielsen Holdings plc today announced its first quarter 2018 results. Revenues were $1,610 million for the first quarter of 2018, up 5.5%, or 2.4% on a constant currency basis, compared to the first quarter of 2017.

> *         *         *

> Revenues within the Watch segment for the first quarter of 2018 increased 8.5% to $834 million, or 7.1% on a constant currency basis, compared to the first quarter of 2017. Audience Measurement of Video and Text revenues increased 12.0%, or 10.5% on a constant currency basis, primarily due to our ongoing investments and continued client adoption of our Total Audience Measurement system. Audio revenues

increased 0.8% on a reported and constant currency basis for the first quarter of 2018. Marketing Effectiveness revenues increased 24.6%, or 22.7% on a constant currency basis, driven by consistent investment in our product portfolio and continued strength in our product initiatives. Other Watch revenues decreased by $16 million, or 32.7% on a reported basis and 35.3% on a constant currency basis, due to continued portfolio pruning.

Revenues within the Buy segment for the first quarter of 2018 increased 2.5% to $776 million, compared to the first quarter of 2017. On a constant currency basis, Buy segment revenues decreased 2.1%, compared to the first quarter of 2017. . . . On a constant currency basis, Buy revenues in developed markets decreased 5.2% compared to the first quarter of 2017, due to continued softness in our U.S. market. Revenues in Corporate Buy decreased by $8 million, or 42.1% on a reported and constant currency basis, primarily due to continued portfolio pruning.

Net income for the first quarter of 2018 increased 1.4% to $72 million, compared to $71 million in the first quarter of 2017, as higher revenues were partially offset by our retailer investments and other growth initiatives. Net income was flat on a constant currency basis. Net income per share on a diluted basis was $0.20 per share for each of the first quarters ended 2018 and 2017.

Adjusted EBITDA for the first quarter of 2018 increased 0.7% to $423 million, compared to the first quarter of 2017. Adjusted EBITDA decreased by 0.7% on a constant currency basis. Adjusted EBITDA margins contracted 125 basis points to 26.3%, or 83 basis points on a constant currency basis, due to our retailer investments and other growth initiatives.

*        *        *

**2018 Full Year Guidance**

To reflect the expected impact of the Tax Cuts and Jobs Act of 2017 ("TCJA"), the Company has increased its 2018 GAAP net income per share guidance range by $0.10 per share to a range of $1.50 to $1.56. The company expects its 2018 effective tax rate to be ~34%.

- GAAP net income per share: **Revised**            **Original**
                                                        $1.50-$1.56        $1.40-$1.46

The company's other full year guidance is unchanged from amounts previously provided, as indicated below:

- Total revenue growth on a constant currency basis: ~3%

- *Adjusted EBITDA margin growth on a constant currency basis*: ~(60)bps

- *Free cash flow: ~$800 million*

27.     On the same day, the Company held a conference call for analysts and investors to discuss the first quarter financial results. The call was hosted by defendants Barns and Jackson. During the call defendants reiterated the first quarter 2018 financial results reported in the press release and assured investors that the Company was currently *on track* to meet fiscal year 2018 financial guidance, including $800 million in free cash flow, by the end of 2018. The Company added another assurance that privacy policy changes by its large data partner, Facebook, would have no impact on its access to data and that the GDPR, despite increased consumer privacy protections, would be a "net positive" for the Company:

> [Jackson:] . . . *We remain on track for 60 basis points of margin compression in 2018* on a constant currency basis with improving trends in the second half as our Buy growth initiatives ramp.

> \*        \*        \*

> [Barns:] . . . In March, Facebook announced policy changes, limiting the availability of third-party datasets for audience targeting on their platform. While access for some firms was curtailed, our relationship with Facebook remains strong. *We still have access to the data that the industry needs for independent third-party measurement*. . . .

> *Another key focus of the industry has been the General Data Protection Regulation, or GDPR, a new EU data protection law going into effect on May 25. We're ready for this. Because we've been at the forefront of privacy compliance for years, many of the steps required by GDPR were already in place. Overall, we see the greater focus on privacy, including GDPR, as a net positive for our position in the marketplace*.

28.     During the April 26, 2018 call, one analyst asked defendants an even more specific question about the Company's ongoing relationship with Facebook and whether the

Company continued to have the *same level* of access to Facebook data that it had previously. Defendant Barns stated that the Company still had access to the data it needed to provide services necessary to deliver all management services to its clients, even if there are some "process" changes being made:

> [Analyst:] I just wanted to follow up on the Facebook commentary and see if there's any additional color that you could provide. It sounded like the relationship is obviously very strong and still intact. But *has there been any change in perhaps the level of data that you're able to get at this point in terms of segmentation that you have access to*? . . .
>
> [Barns:] . . . As you mentioned, it is a very long-running and very strong relationship that we have with Facebook. *We still have access to the data we need for our measurement products. For some of our products, the analytics products, we've had to make some process changes. We are in the process of making some process changes in order to accommodate some of their policy changes. But we're still able to deliver all those products to our clients in the marketplace and we don't see any change in that going forward. I think one of the reasons why we've weathered this period especially well, relatively well, better than, I think, a lot of the other data partners with Facebook, is because* we've always taken a more conservative approach with regard to consumer data protection, consumer data privacy. . . . *So yes, again we're in a very good position. I think as we think about the implications of the Facebook situation and the implications of GDPR, we really think all of this plays as a net positive for our business and our position in the marketplace as it unfolds*.

29.    On April 26, 2018, BMO Capital Watch issued a report discussing the first quarter 2018 results entitled, "Solid Organic Watch Results Overshadowed by Weak Buy FCF." The report expressed some skepticism around the ability to meet the Company's free cash flow guidance for 2018, but identified Watch as a strong indicator of confidence and growth:

> **Bottom Line**: We believe today's move reflects the 1Q EBITDA miss and some skepticism about the ability to track toward FY2018 guidance, particularly FCF, which came in at -$245mm versus -$74mm last year. While Buy remains the primary challenge, *Watch had a strong organic revenue growth quarter (+6.2% vs. our +5.0% estimate). We continue to believe improving investor sentiment and solid results out of*

*Watch can help the shares work toward our $38 target and FY2018 guidance is attainable*.

\*　　\*　　\*

**Guidance**. *Management maintained its 2018 guidance for 3% CC revenue growth and ~60 bps of adjusted EBITDA margin compression*. However, it raised its GAAP EPS guidance from $1.40-1.46 to $1.50-1.56 to reflect the recent Tax Act and now targets a 2018 GAAP tax rate of ~34%. *Despite the weak free cash flow quarter (-$245mm) and unfavorable FX movements (relative to prior guidance), the company maintained its FCF guidance of $800mm for FY2018*.

**Watch**. With noise from acquisitions/dispositions backed out, *organic revenue growth of 6.2% beat our 5.0% and was the highest rate of growth* (by our estimates) since 1Q14 (excluding 4Q17, when it benefited from the timing of deliveries within Audio). 1Q results were driven by strength in digital *(Digital Ad Ratings campaigns were up 55% in 1Q)* and its National TV ratings business. We see this supporting an acceleration in Watch organic revenue growth this year (from +4.3% in FY2017 to +5.9% in FY2018).

**Buy**. Organic revenue growth of -1.3% was worse than our -0.7% estimate, driven by weak Developed Buy results and lighter-than-expected Emerging Markets growth. With Buy's ongoing growth initiatives ramping and facing easy comps in 2H18, *we expect organic growth rates to pick up in the back half of the year*.

30.     Although investors were disappointed with the first quarter 2018 results in the Buy segment, they were encouraged by growth in Watch and the Company's assurances that it still had access to all of the Facebook data it needed to deliver its services to clients and that it was on track to meet its guidance of $800 million in free cash flow. As a result, the Company's share price maintained and traded at artificially inflated levels of over $31.00 per share.

31.     On May 15, 2018, the Company presented at the Needham Emerging Technology Conference. The presentation was led by Nielsen Senior Vice President of Product Leadership Kelly Abcarian ("Abcarian"). During the conference Abcarian was asked whether, in light of increased congressional interest in regulation over consumer privacy and the recent Facebook

testimony in front of Congress, Nielsen would continue to have access to the third-party large data sets that fuel its analytics and measurement products delivered to its clients. Abcarian stated that because Nielsen only uses aggregated data, as opposed to personal data, even "if the world goes on a complete lockdown tomorrow" Nielsen could still produce the measurement data that advertisers and sellers can use to monetize their inventory:

> [Analyst:] So that brings up this issue of Facebook and testimony in front of the Internet, in front of the Congress?

> *     *     *

> ***How long are you going to be able to bring in all those big data sets before Congress says, "No, no, you're violating somebody's privacy"? And what impact would that have on Nielsen's measurement ability if they can't get these third-party data sets integrated into their own measurement?***

> [Abcarian:] Well, everything we do, we engineer our products using privacy-by-design principles. And our Chief Privacy Officer spends a lot of time understanding regulation and changes in consumer. ***And in fact, whether it was the Facebook or other things, the way in which Nielsen works with these big data providers, we're not looking for respondent-level data.*** We're looking for an ability to create aggregated insights because Nielsen has strong opted-in consumer-compliant panels that we can use the intelligence from in which to basically create the persons-based estimates that are required to drive and fuel the industries.
> So I don't – who knows where the industry will go? What I do know is that Nielsen stands in a really strong point because we have invested for 6-plus decades in building high-quality consumer opted-in panels. ***So if the world goes on a complete lockdown tomorrow, Nielsen can still produce measurement in which advertisers and sellers can continue to still monetize their audiences and sell their inventory.***

> [Analyst:] And it sounds like the data sets you're bringing in are all non-persons – they're all non-person, they're big aggregates, so they're not violating data privacy.

> [Abcarian:] Yes. We anonymize – the way in which we work with it, we're never working at an individual respondent level. It's anonymized and aggregated data that we then produce out to the marketplace.

32.    On May 25, 2018, the European Union adopted the GDPR codifying regulation around the collection and usage of personally identifying information, including information that Nielsen had access to and processes from large data sets from Facebook and others to provide analytics services to its clients.

33.    On May 31, 2018, the Company presented at the Sanford C. Bernstein Strategic Decisions Conference. The conference was led by defendant Barns. During the conference, Barns was again specifically asked about Nielsen's access to large data sets from third parties like Facebook and the information used for the Company's measurement services. Barns boasted that Nielsen still had access to "all" the data it needed to provide measurement services and Nielsen was in better position than other companies that might be affected by privacy changes at Facebook:

> [Analyst:] All right. And you mentioned – actually in the 5-year, what might concern you sort of overall, geopolitical and privacy concerns. Certainly for your panel-based solutions, there's really no privacy issue, but – that I can think of, but when you – when I think about, especially, some of the inputs you use for your digital side of your business and your relationship with Facebook in that regard, anything we should be – *anything changing there about your ability to work with Facebook and use their help together to – as an ingredient to how you characterize digital audiences? Anything going on there that we should be thinking about*.

> [Barns:] *For measurement, we still have the access to all the data that we need for our measurement products, including our relationship with Facebook*. I think a reason why we weren't as affected as some other firms who may receive data from Facebook or others is because we've always, historically, taken a fairly conservative approach to how we use data, handle data, manage data, and that conservative approach served us pretty well in this particular instance. *And so yes, that's been more of a nonevent from our side as compared to how it played out for some others*.

34.    In addition, analysts specifically asked Barns whether the Company still had confidence in its ability to deliver $800 million in free cash flow for the fiscal year 2018 and Barns assured investors that Nielsen was still on track to do so:

> [Analyst:] . . . ***How about the fiscal year '18 guide***? ***What comfort can you give, especially regarding the cash flow targets set here***, which is probably somewhat a function of – it seems like some cash went missing in Q1 in particular, or maybe working capital. So the question is, ***what comfort can you give regarding this year's cash flow targets***. . . .

> [Barns:] Yes, first quarter, our free cash flow is in the minus $275 million range. A lot of that reflected the investments we're making associated with retailers and other components of our 3-year plan. And so usually, the first quarter for us is not positive from a free cash flow point, you made that point before. And the prior year was minus $70-ish million, and a bigger number this year reflecting those investments. ***Our free cash flow target for the year is $800 million***. Most of our free cash flow historically shows up in the second half of the year and particularly the fourth quarter. ***And so that's what we're working on to deliver, and we're on track for that***.

35.    Following the May 31, 2018 conference, Nielsen common stock continued to trade at artificially inflated prices, closing at $30.17 per share on May 31, 2018.

36.    On June 5, 2018, the Company presented at the Robert W. Baird Global Consumer, Technology & Services Conference. During the conference, the Company was asked yet again whether changes to third-party data sets like Facebook would have any impact on the Company's business. And again, the Company assured investors that such policy changes would have no impact on Nielsen's ability to provide revenue-generating measurement data to its clients:

> [Analyst:] Okay. ***And then Facebook had a lot of headlines recently. There's been some policy changes there***. Obviously, a big digital marketing platform. It's also a partner in enabling Nielsen digital measurement. ***So the changes to their policies, any impact on Nielsen***?

> [Neilsen:] Yes. Look, for more than a decade, we've built our products and services based on privacy by design, which is also fueling

kind of the GDPR principles. And everything that we do has been built on those privacy principles into our products and services. When we work with Facebook, the data that we're providing back in the form of measurement is aggregated and anonymized. At no point in time is it ever individualized or respondent level. And all of that is being done in a safe haven environment than anonymization and aggregation. ***And so our product measurements continue to be able to leverage that partnership and execute on the measurement aspects of that because at no means are we producing any kind of respondent-level data against that partnership***.

37.    The statements referenced in ¶¶ 23-24, 26-28, 31, 33, 34, and 36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Nielsen recklessly disregarded its readiness for and the true risks of privacy related regulations and policies, including the GDPR, on its current and future financial and growth prospects; (ii) Nielsen's financial performance was far more dependent on Facebook and other third-party large data set providers than previously disclosed and privacy policy changes affected the scope and terms of access Nielsen would have to third-party data; (iii) access to Facebook and other third-party provider data was becoming increasingly restricted for Nielsen and Nielsen clients; and (iv) as a result, Nielsen's public statements were materially false and misleading at all relevant times.

**The Truth Begins To Emerge**

38.    On July 26, 2018, Nielsen issued a press release announcing its financial results for second quarter 2018. The financial results: (i) significantly missed the Company's public net income and free cash flow estimates by a wide margin; and (ii) reduced previously reaffirmed 2018 financial guidance. The Company placed the blame squarely on the effectiveness of the GDPR which it had assured investors it was "ready for." In addition, the

Company announced it would do a "deep dive" into its "Buy" segment of operations and that CEO and Executive Chairman of the Board Barns would be departing the Company at the end of 2018:

### NIELSEN REPORTS 2nd QUARTER 2018 RESULTS

*Conducting a Strategic Review of Buy Segment*

. . . Nielsen Holdings plc today announced its second quarter 2018 results. The company also announced it is conducting an in-depth strategic review of Nielsen's Buy segment. In a separate release issued today, Nielsen announced that James Attwood would assume the role of Executive Chairman of the Board and Mitch Barns, current CEO, would retire at the end of 2018.

**Revenues were $1,647 million for the second quarter of 2018, up 0.2%, or down 0.7% on a constant currency basis, compared to second quarter of 2017. Net income per share on a diluted basis was $0.20 per share in the second quarter of 2018, compared to $0.37 per share in the second quarter of 2017.**

"In the second quarter, we continued to move forward on our multi-year transformations across Watch, Buy, and Operations. However, **our progress was not reflected in our financial results, which are disappointing and came in below our expectations, and we are lowering our outlook for 2018**," said Jamere Jackson, Chief Financial Officer of Nielsen.

. . . "**In Watch, ongoing adoption of Total Audience Measurement continued to drive growth. However, the General Data Protection Regulation and changes in the consumer data privacy landscape impacted our growth rates in the near-term as clients and partners grapple with the changes and work to ensure compliance**."

### Second Quarter Results

Revenues within the Watch segment for the second quarter of 2018 increased 4.5% to $858 million, or 4.0% on a constant currency basis, compared to the second quarter of 2017. Audience Measurement of Video and Text revenues increased 7.4%, or 6.7% on a constant currency basis, primarily due to our ongoing investments, continued client adoption of our Total Audience Measurement system, and a strong contribution from Gracenote. Audio revenues were flat for the quarter. **Marketing Effectiveness revenues increased 7.2%, or 6.0% on a**

*constant currency basis, driven by consistent investment in our product portfolio and strength in our product initiatives, partly offset by pressure on our clients and partners from the impact of the General Data Protection Regulation (GDPR) and other consumer data privacy considerations. Other Watch revenues decreased by $11 million, or 22.9% on a reported basis and 21.3% on a constant currency basis, due to our continued portfolio pruning. Our Core Watch revenues grew 6.2%, or 5.5% on a constant currency basis*.

Revenues within the Buy segment for the second quarter 2018 decreased 4.1% to $789 million, or 5.4% on a constant currency basis, compared to the second quarter of 2017. . . . *Buy revenues in Developed Markets decreased 4.3%, or 6.9% on a constant currency basis, due to increased pressure on spending from large multinational clients. Revenues within Corporate Buy decreased by $9 million, or 55.6% on a constant currency basis, primarily due to continued portfolio pruning*.

Net income for the second quarter of 2018 *decreased 45.0%* to $72 million, or 45.9% on a constant currency basis, compared to $131 million in the second quarter of 2017, as a result of softer revenues, higher restructuring charges, retailer investments, and other growth initiatives. *Net income per share on a diluted basis was $0.20 per share, compared to $0.37 per share in the second quarter of 2017. During the second quarter of 2018, the company recorded restructuring charges of $65 million, or $0.12 per share*.

Adjusted EBITDA for the second quarter of 2018 *decreased 8.1%* to $468 million, or 8.2% on a constant currency basis, compared to the second quarter of 2017. *Adjusted EBITDA margins contracted 254 basis points to 28.4%, or 232 basis points* on a constant currency basis, due to softer revenue and continued investments in our Buy and Watch segments, partly offset by productivity initiatives.

**Financial Position**

\*      \*      \*

Cash flow from operations increased to $242 million for the second quarter of 2018, from $226 million in the second quarter of 2017. *Free cash flow for the second quarter of 2018 decreased to $124 million, compared to $162 million in the second quarter of 2017. Cash flow performance was driven by lower net income, higher net capital expenditures, higher interest, and tax payments, partially offset by the timing of vendor and client payments*.

39.     The second quarter 2018 press release also issued sharp revisions to revenue, earnings and free cash flow guidance, which was sharply below guidance issued in April 2018 after the first quarter 2018 financial results:

### 2018 Full Year Guidance

Given the first half performance and second half outlook, the company is updating its full year guidance as highlighted below:

|  | Revised | April |
|---|---|---|
| Total Revenue (constant currency basis) | ~(1%) | ~3% |
| Adjusted EBITDA margin growth (constant currency basis) | *~(230)bps* | *~(60)bps* |
| GAAP net income per share | *$0.95 - $1.00* | *$1.50 - $1.56* |
| Free cash flow | *$550 - $575M* | *~$800M* |

40.     Following the issuance of the July 26, 2018 press release, the Company held a conference call for analysts and investors to discuss the disappointing second quarter 2018 results. In addition to reiterating the financial results and sharply reduced financial guidance, the Company attributed much of the shortfall to the impact of the GDPR. During the call, defendants explained the following:

[Jackson:] . . . *On non-GAAP basis, total revenue was down 70 basis points constant* currency and on an organic basis. Adjusted EBITDA was $468 million, down 8.2% constant currency, and adjusted EBITDA margins were 28.4%, down 232 basis points on a constant currency basis. *Margins were impacted by softer revenue and continued investments in our Watch and Buy segments*. This was partly offset by our productivity initiatives. Free cash flow was $124 million, down from a record $162 million a year ago. . . .

. . . The key takeaway is that the fundamentals of our Watch segment remain strong. This includes strong growth in Audience Measurement of Video and Text, the core of our Watch franchise. *However, we are seeing some short-term pressure from GDPR and*

*privacy changes that are impacting our second quarter results and our 2018 outlook.*

\*     \*     \*

*Our results are significantly below our expectations as revenues were impacted by GDPR and changes to the consumer data privacy landscape. We have several hundred clients and data partners in this space, and market changes have been disruptive.*

41.    In addition to the effect of the GDPR and changes in the data privacy landscape impacting second quarter 2018 results, the Company explained that it would also cut into the 2018 financial outlook which it had recently reaffirmed:

[Jackson:] There are a few dynamics that cause us to have a more conservative outlook for 2018. *First, the digital advertising ecosystem saw a disruption in the second quarter as large digital platforms made changes to their offerings to increase security for consumer data. Second, we expect operational and policy changes on third-party targeting to contribute to a slowdown in the back half of the year. Third, GDPR and changes in the consumer data privacy landscape is a near-term challenge that has clients and data suppliers working towards compliance as it relates to targeting and data usage rights.* Now this is a short-term disruption, but it may take some time before the market stabilizes. As such, we're moderating our second half outlook in Marketing Effectiveness accordingly.

\*     \*     \*

To sum up on Watch, the fundamentals of our business remain strong . . . *however, we expect our second half results to be impacted by the changing consumer data privacy landscape, as I mentioned, and we're lowering our 2018 Watch revenue outlook to approximately 2.5% growth on a constant currency basis.*

42.    As a result of these alarming disclosures and significant reduction in the Company's outlook for free cash flow, Nielsen's stock price declined more than 25% from a close of $29.57 per share on July 25, 2018 to a close of $22.11 per share on July 26, 2018, a massive volume of 38 million shares traded.

43.     The market for Nielsen common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, Nielsen common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Nielsen common stock relying upon the integrity of the market price of Nielsen common stock and market information relating to Nielsen, and have been damaged thereby.

44.     During the Class Period, defendants materially misled the investing public, thereby inflating the price of Nielsen common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

45.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Nielsen's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of Nielsen and its business, prospects and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were

revealed to the market, the inflation in the price of Nielsen common stock was removed and the price of Nielsen common stock declined dramatically, causing losses to plaintiff and the other members of the Class.

### ADDITIONAL SCIENTER ALLEGATIONS

46.     As alleged herein, Nielsen and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Nielsen, their control over, and/or receipt and/or modification of Nielsen's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Nielsen, participated in the fraudulent scheme alleged herein.

### LOSS CAUSATION/ECONOMIC LOSS

47.     During the Class Period, as detailed herein, defendants made false and misleading statements about Nielsen's business and prospects and engaged in a scheme to deceive the market. This artificially inflated Nielsen's stock price and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Nielsen's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time. As a result of their purchases of Nielsen common stock during the

Class period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

48.     Nielsen's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

49.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of Nielsen who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

50.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiff and other members of the Class purchased Nielsen common stock between the time defendants misrepresented or failed to disclose material facts and the time true facts were disclosed, without knowledge of the misrepresented or omitted facts.

51.    At all relevant times, the market for Nielsen common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Nielsen filed periodic public reports with the SEC; and

(b)    Nielsen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

52.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or acquired Nielsen common stock during the Class Period (the "Class"). Excluded from the Class are defendants and their family members, directors and officers of Nielsen and their families and affiliates.

53.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Nielsen has more than 355 million shares of stock outstanding, owned by thousands of persons.

54.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by defendants;

(b)     Whether defendants omitted and/or misrepresented material facts;

(c)     Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of Nielsen common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

55.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

56.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

57.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

58.    Plaintiff incorporates ¶¶ 1-57 by reference.

59.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Nielsen common stock during the Class Period.

61.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Nielsen common stock. Plaintiff and the Class would not have purchased Nielsen common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

62.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Nielsen common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

63.     Plaintiff incorporates ¶¶ 1-62 by reference.

64.     The Individual Defendants acted as controlling persons of Nielsen within the meaning of §20 of the Exchange Act. By virtue of their positions and their power to control public statements about Nielsen, the Individual Defendants had the power and ability to control the actions of Nielsen and its employees. Nielsen controlled the Individual Defendants and its other officers and employees. By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and roper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  August 22, 2018

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
Email:  jalieberman@pomlaw.com
         ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
(212) 697-6484
peretz@bgandg.com

***Attorneys for Plaintiff***